REVISED  10/4/22

# United States Court of Appeals
## for the Fifth Circuit

No. 21-10644

United States Court of Appeals
Fifth Circuit

**FILED**

September 30, 2022

Lyle W. Cayce
Clerk

DE'ON L. CRANE, *Individually and as the Administrator of the Estate of* TAVIS M. CRANE *and on behalf of the Statutory Beneficiaries*, G. C., T. C., G. M., Z. C., *and* A. C., *the surviving children of* TAVIS M. CRANE; ALPHONSE HOSTON; DWIGHT JEFFERSON; VALENCIA JOHNSON; Z. C., *Individually, by and through her guardian* ZAKIYA SPENCE,

*Plaintiffs—Appellants,*

*versus*

CITY OF ARLINGTON, TEXAS; CRAIG ROPER,

*Defendants—Appellees.*

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:19-CV-91

Before HIGGINBOTHAM, DENNIS, and GRAVES, *Circuit Judges*.

PATRICK E. HIGGINBOTHAM, *Circuit Judge*:

No. 21-10644

In 1996, the Supreme Court approved the use of pretextual stops in *Whren v. United States*.[1] Since then, pretextual stops have become a cornerstone of law enforcement practice.[2] Police officers follow a suspicious person until they identify a traffic violation to make a lawful stop, even though the officer intends to use the stop to investigate a hunch that, by itself, would not amount to reasonable suspicion or probable cause.[3] Often pulled over for minor traffic violations, these stops create grounds for violent—and often deadly—encounters that disproportionately harm people of color.[4]

When *Whren* was decided, the Court did not have what we have now—twenty-five years of data on the effects of pretextual stops.[5] Indeed, the *Whren* Court differentiated pretextual stops from "extreme practices" like the use of deadly force.[6] Today, traffic stops and the use of deadly force are too often one and the same—with Black and Latino drivers

---

[1] 517 U.S. 806, 810 (1996).

[2] David D. Kirkpatrick, Steven Eder & Kim Barker, *Cities Try to Turn the Tide on Police Traffic Stops*, N.Y. TIMES (Apr. 15, 2022), https://www.nytimes.com/2022/04/15/us/police-traffic-stops.html.

[3] Stephen Rushin & Griffin Edwards, *An Empirical Assessment of Pretextual Stops and Racial Profiling*, 73 Stan. L. Rev. 637, 640 (2021).

[4] *See* Sam Levin, *US Police Have Killed Nearly 600 People in Traffic Stops Since 2017, Data Shows*, GUARDIAN (Apr. 21, 2022), https://www.theguardian.com/us-news/2022/apr/21/us-police-violence-traffic-stop-data ("Black drivers make up 28% of those killed in traffic stops, while accounting for only 13% of the population. Research has consistently found that Black and brown drivers are more likely to be stopped, searched and subjected to force.").

[5] *See* Rushin & Edwards, *supra*, at 657–58 (noting the emergence of race-profiling research as a modern field of study).

[6] *Whren*, 517 U.S. at 818.

No. 21-10644

overrepresented among those killed—and have been sanctioned by numerous counties and major police departments.[7]

While several major cities have restricted the practice,[8] in much of America, police traffic stops still seine for warrants despite the shadows of *Monell v. Department of Social Services*,[9] where a § 1983 claim can succeed against a city with a showing that city policy was the moving force behind a constitutional injury, and was implemented with deliberate indifference to the known or obvious consequence that constitutional violations would result.[10] The potential liability attending a policy of pretextual stops aside, their empirical consequences are clear: they lead to the unnecessary and tragic ending of human life. Here, a child threw a candy cane out the window. Twenty-five minutes later, the driver, her father, was dead.

To be clear, we apply only settled laws that govern this case today, cast as they are against the larger frame of their play in the streets across the country.

## I.

Tavis Crane's estate and the passengers of Crane's car sued Arlington Police Officer Craig Roper and the City of Arlington for the use of excessive

---

[7] Kirkpatrick et al., *supra*.

[8] Los Angeles, Philadelphia, Pittsburgh, Seattle, Berkeley, and the State of Virginia have all banned or restricted pretextual stops. *Id.*; *see* LOS ANGELES POLICE DEPARTMENT MANUAL §240.06 (2022) (established by Special Order No. 3); Achieving Driving Equality, PHILA. CODE §§ 12-1701–1703 (2021); Pittsburgh, Pa., PGH CODE ORDINANCES § 503.17 (2021); SEATTLE POLICE DEPARTMENT MANUAL § 6.220 (2020); BERKELEY POLICE DEP'T, LAW ENFORCEMENT SERVICES MANUAL §401(2) (2022); VA. CODE ANN. §§ 46.2-1014, 46.2-1052, 46.2-646, 46.2-1157 (limiting ability to use evidence discovered or obtained as a result of a stop for a minor traffic violation).

[9] 436 U.S. 658 (1978).

[10] *Alvarez v. City of Brownsville*, 904 F.3d 382, 389–90 (5th Cir. 2018) (en banc).

No. 21-10644

force during a traffic stop in violation of the Fourth Amendment. The district court dismissed the passengers' claims, finding that they could not bring claims as bystanders, and granted summary judgment to Roper and the City after determining that Roper was entitled to qualified immunity. We affirm the dismissal of the passengers' claims and vacate the grant of summary judgment on Crane's claims and remand to the district court for further proceedings consistent with this opinion.

On February 1, 2017, Tavis Crane was driving in Arlington, Texas with three passengers: Dwight Jefferson, Valencia Johnson, who was pregnant with Crane's child, and Z.C., Crane's two-year-old daughter. While Crane was stopped at a traffic light at approximately 11:38 p.m., Officer Elsie Bowden pulled up behind him. After the light turned green, Crane pulled away from the intersection and Bowden saw an object being tossed from the passenger's side. She claims that she thought the object might be a crack pipe and called for backup; Roper responded.

Bowden turned on her police car's lights and Crane pulled over. Bowden approached the passenger side of the vehicle and asked Jefferson what he threw out the window. Jefferson replied that the only thing he threw was a cigarette butt. Bowden asked Crane for his driver's license and proof of insurance. Crane provided Bowden with his identification card, as he did not have a driver's license. Bowden then noticed an object fall on the ground behind her, outside the window by Z.C. She recognized the object as the red top of a large plastic Christmas candy cane and realized the object thrown from the car was the candy cane's clear bottom half. Bowden laughed about the misunderstanding and handed the red piece back to Z.C. But she did not send the family on. Rather, she returned to her vehicle and ran a warrant check, which found that Crane had warrants for several misdemeanors and a possible felony probation violation.

No. 21-10644

Bowden requested additional backup and confirmation of the warrants and was informed that Officer Eddie Johnson was also en route. While waiting for the other officers to arrive, she confirmed five misdemeanor warrants from Grand Prairie but was still waiting for a reply from Dallas County for the felony probation warrant, and began writing Crane a citation for driving without a license.

At 11:47 p.m., Officer Johnson arrived. Bowden informed him that the passengers had been cooperative and that she wasn't sure if Crane even knew he had a warrant out. Roper arrived after that conversation and received no briefing, knowing only the information relayed to his in-car computer display, which showed Crane's unconfirmed outstanding warrant for a felony probation violation.

All three officers then approached Crane's car at 11:50 p.m., by which point Crane had rolled up his window almost entirely. Bowden stood next to Crane's window; Roper was behind Bowden, next to Valencia Johnson, with Officer Johnson on the other side of the car, next to Jefferson. Bowden asked Crane to step out of the car because he had outstanding warrants, which Crane denied. Bowden told Crane that if he did not get out of the car, he would face additional charges. Crane said he needed to get Z.C. home to her mother. Bowden asked if he could leave Z.C. with the other passengers and alternatively offered to call someone to pick her up. Crane refused, insisting that he did not have any outstanding warrants and reiterating that he was not getting out. Bowden told him five tickets had been confirmed. Crane asked what the warrants were for. Bowden said she didn't know yet. Bowden told Crane, "I need you to step out of the car, honey. Tavis if you go and do something stupid then we are gonna be breaking windows, it's gonna get crazy, it ain't worth it."

No. 21-10644

Officer Johnson ordered Jefferson, sitting in the passenger seat, to turn off the car and give him the key. Jefferson began moving his hand toward the key to comply, but Crane told him to stop. Roper then ordered Valencia Johnson to unlock the rear driver's side door where she was seated; she did. Roper opened the door, unholstered his pistol, and ordered everyone to put their "f---ing hands up." Crane, Jefferson, and Valencia Johnson all put their hands up. He initially pointed his pistol at Jefferson before entering the car, climbing over Valencia Johnson, and pointing his gun at Crane.

According to the passengers, Roper put his arm around Crane's neck. Roper contends that he grabbed the hood of Crane's sweatshirt. All three officers continued to order Crane to open the door and turn the car off. Officer Johnson circled behind Crane's car to move next to Bowden as she shouted "Tavis don't do it." The car engine began to rev, and the car shook as the brake lights turned on and off sporadically. Bowden reached for Roper in the back seat, and told Roper three times to "get out" of the car. Roper remained in the car. Officer Johnson broke the window next to Crane with his baton as Bowden began to move toward the rear of the car.

The passengers contend that when Crane, with Roper's gun pointed at him, moved his hand to turn off the car in compliance with Roper's order, Roper shot him, his head fell backwards, the engine revved and the car lurched backward, striking Bowden—by now behind the car—before moving forward and running over Bowden again and speeding off.

Roper claims that Crane shifted the car in gear while the two struggled, and that it was only after the car ran over Bowden and after Roper warned Crane that he would kill him if Crane did not stop the car that Roper shot Crane twice. Roper claims that the first two shots "did not cause Crane to stop the vehicle, [so] he fired two other shots."

No. 21-10644

After Roper shot Crane, the car careened down the road and Roper took the keys out of the ignition and steered the car to a stop. Officer Johnson caught up in his squad car and told Roper to pull Crane from the driver's seat and perform CPR. Roper continued to shout and curse at Crane, asking why he had not stopped, but Crane was silent. An autopsy concluded that Crane was shot four times and died of gunshot wounds to his abdomen.

## II.

On January 31, 2019, Crane's mother, as the administrator of Crane's estate and on behalf of his surviving children, and the other passengers filed a 42 U.S.C. § 1983 claim against the City of Arlington and Officer Roper, individually and in his official capacity. The plaintiffs allege that Roper violated their Fourth Amendment rights and that the City is liable under *Monell v. Department of Social Services*.[11]

The City and Roper moved to dismiss the plaintiffs' claims. The district court concluded that the passengers—Jefferson, Valencia Johnson, and Z.C.—could not bring claims as bystanders and dismissed their claims with prejudice but denied the motions to dismiss Crane's claims.

Asserting qualified immunity, Roper then moved for summary judgment, which the district court granted. The district court acknowledged that Valencia Johnson and Roper presented different accounts of when the first shot occurred,[12] but found that "a reasonable jury could not believe [the passengers'] account of the shooting."[13] Finding Roper entitled to qualified

---

[11] 436 U.S. 658 (1978).

[12] *Crane v. City of Arlington*, 542 F. Supp. 3d 510, 513 (N.D. Tex. 2021) ("The backseat passenger swears the shot occurred *before* the car started reversing . . . . The officers claim Roper fired his gun *after* the car ran over Bowden the second time.").

[13] *Id.* at 514.

immunity, the district court dismissed Crane's claims against Roper and the City with prejudice.[14] The plaintiffs timely appealed the order on the motion to dismiss and the grant of summary judgment.

## III.

We review *de novo* a district court's grant of summary judgment.[15] Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[16] "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[17] We may affirm on any grounds supported by the record and presented to the district court.[18]

We likewise review *de novo* a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6).[19] To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."[20] When reviewing a motion to dismiss, we "must accept all facts as pleaded and construe them in the light most favorable to the plaintiff."[21]

---

[14] *Id.*

[15] *Aguirre v. City of San Antonio*, 995 F.3d 395, 405 (5th Cir. 2021).

[16] Fed. R. Civ. P. 56(a).

[17] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[18] *Hernandez v. Velasquez*, 522 F.3d 556, 560 (5th Cir. 2008).

[19] *Waste Mgmt. La, L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 963 (5th Cir. 2019).

[20] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[21] *Reed v. Goertz*, 995 F.3d 425, 429 (5th Cir. 2021) (internal quotation marks and citations omitted).

No. 21-10644

## IV.

First, we review the district court's grant of summary judgment. "When a defendant official moves for summary judgment on the basis of qualified immunity, 'the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law.'"[22] All facts must be viewed in the light most favorable to the nonmovant and all justifiable inferences must be drawn in his favor.[23]

When there is video evidence in the record, courts are not bound to accept the nonmovant's version of the facts if it is contradicted by the video.[24] But when video evidence is ambiguous or incomplete, the modified rule from *Scott v. Harris* has no application.[25] Thus, "a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account."[26]

The district court acknowledged the competing factual accounts—specifically when Roper shot Crane—but relied on the dashcam video from Bowden's patrol car to reject Crane's account and adopt Roper's account. But the video does *not* clearly contradict Crane's account of events such that the district court was entitled to adopt Roper's factual account at the summary judgment stage. "*Scott* was not an invitation for trial courts to

---

[22] *Aguirre*, 995 F.3d at 406 (quoting *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018)).

[23] *Darden*, 880 F.3d at 727.

[24] *Harris v. Serpas*, 745 F.3d 767, 771 (5th Cir. 2014) (citing *Scott v. Harris*, 550 U.S. 372, 381 (2007)).

[25] *Aguirre*, 995 F.3d at 410 (citing *Scott*, 550 U.S. at 378).

[26] *Darden*, 880 F.3d at 730.

abandon the standard principles of summary judgment by making credibility determinations or otherwise weighing the parties' opposing evidence against each other any time a video is introduced into evidence."[27]

What happened inside Crane's car is not visible in the dashcam video. As such, the video does not resolve the relevant factual disputes. It is not clear from the video when Roper shot Crane, when Crane became unconscious, whether the car moved before or after Roper shot Crane, and whether Roper had his arm around Crane's neck or was grabbing Crane's sweatshirt. Because the video evidence does not clearly contradict Crane's account, for purposes of this appeal, we must take Crane's account as true[28]—that Roper had Crane in a chokehold and that Roper shot Crane before the car began to move.

The district court found that the gear could change and the car could move only with the conscious intention of Crane.[29] But that conclusion ignores the other plausible explanation that the gears were shifted during the struggle between Crane and Roper, as Crane attempted to comply with Roper, and that the chokehold caused Crane to press down on the accelerator as an attempt to relieve the stress on his neck, as opposed to attempting to flee. When two conclusions are plausible, at the summary judgment stage, we must accept as true that which is most favorable to the nonmovant.[30] The district court erred by applying its own interpretation of the video and accepting Roper's factual account over Crane's of what occurred inside the

---

[27] *Aguirre*, 995 F.3d at 410.

[28] *See Darden*, 880 F.3d at 730 ("[A] court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account.").

[29] *Crane*, 542 F. Supp. 3d at 514.

[30] *Darden*, 880 F.3d at 727.

No. 21-10644

car. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter," that job is reserved for the jury.[31]

## A.

Next, we must consider whether Roper is entitled to qualified immunity under Crane's account of events. We hold he is not at this stage.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[32] When reviewing a motion for summary judgment based upon the affirmative defense of qualified immunity, we engage in a two-pronged inquiry.[33] First, the constitutional question, asking whether the officer's conduct violated a federal right.[34] Second, asking whether that right was clearly established at the time of the violation.[35]

The constitutional question in this case is governed by the principles enunciated in *Tennessee v. Garner*[36] and *Graham v. Connor*,[37] which establish that claims of excessive force are determined under the Fourth Amendment's "objective reasonableness" standard.[38] Specifically regarding

---

[31] *Id.* at 730.

[32] *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (internal quotation marks and citation omitted).

[33] *Aguirre*, 995 F.3d at 406.

[34] *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam).

[35] *Id.* at 656.

[36] 471 U.S. 1 (1985).

[37] 490 U.S. 386 (1989).

[38] *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (quoting *Graham*, 490 U.S. at 388).

No. 21-10644

deadly force, Justice White explained in *Garner* that it is unreasonable for an officer to "seize an unarmed, nondangerous suspect by shooting him dead;" but, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."[39]

We analyze the reasonableness of the force used under factors drawn from *Graham*, including the severity of the crime at issue, whether the suspect poses a threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest.[40] While all factors are relevant, the "threat-of-harm factor typically predominates the analysis when deadly force has been deployed."[41] The reasonableness is judged from the perspective of a reasonable officer on the scene,[42] and only the facts then knowable to the defendant officers may be considered.[43]

First, we address whether Crane posed an immediate threat to the safety of the officers. Accepting the facts as the passengers allege, Crane was shot while unarmed with Roper's arm around his neck. Roper first argues that he had a reasonable fear that Crane might have a weapon. But from his position, Roper could see if Crane was reaching for a gun, as could the other officers outside the vehicle, yet none of them—including Roper—reported a

---

[39] *Garner*, 471 U.S. at 11.

[40] 490 U.S. 386, 396 (1989).

[41] *Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021).

[42] *Graham*, 490 U.S. at 396.

[43] *White v. Pauly*, 580 U.S. 73 (2017) (per curiam); *see also Cole v. Carson*, 935 F.3d 444, 456 (5th Cir. 2019), *as revised* (Aug. 21, 2019) (en banc) ("[W]e consider only what the officers knew at the time of their challenged conduct.").

No. 21-10644

suspicion of a weapon. Roper could not have reasonably suspected that Crane had a weapon.

Roper alternatively contends that the threat came from the car.[44] As seen in the video, prior to the first shot, Crane's car was parked, the engine revved, and the tires spun. As the district court noted, Roper was inside the car with the door open, so had Crane sped off, Roper could have fallen out and been seriously injured.[45] However, accepting the facts as Crane alleges, Roper shot Crane while the car was still in park and before the car began to move. As Roper was not at imminent risk of being expelled from a parked car, the vehicle did not in this sense pose a serious threat. Roper also asserts that Bowden and Officer Johnson were in danger, but at the time Roper shot Crane, Bowden and Officer Johnson were standing to the side of Crane's car, not behind it, unlikely to be hit by the car.[46] Ultimately, the car was not a threat until it began to move, which did not occur until Roper shot Crane. Whether Roper's use of deadly force was reasonable may well turn on

---

[44] See *Scott*, 550 U.S. at 379, 383 (noting that, in certain circumstances, a moving vehicle can pose a threat to individuals in its vicinity).

[45] See *Harmon*, 16 F.4th at 1164 ("Common sense confirms that falling off a moving car onto the street can result in serious physical injuries.").

[46] Only after the alleged first shot did Bowden walk behind the car, when she was then run over.

No. 21-10644

whether the car was in park or moving at the moment Roper shot Crane.[47] But that is a question for the jury.[48]

Finally, this Court considers the speed with which an officer resorts to force where officers deliberately, and rapidly, eschew lesser responses when such means are plainly available and obviously recommended by the situation.[49] Officer Bowden demonstrated an admirable attempt to negotiate with Crane. Roper, on the other hand, shot Crane less than one minute after he drew his pistol and entered Crane's backseat aside a pregnant woman and a two-year-old.[50] Not only was the option to get out of the car—as opposed

---

[47] *Compare Brosseau*, 534 U.S. at 197, 200 (holding a vehicle was a threat when it was driven in a manner indicating a willful disregard for the lives of others), *and Harmon*, 16 F.4th at 1165 (holding a vehicle was a threat as it sped off with an officer holding on to its edge), *with Deville v. Marcantel*, 567 F.3d 156, 169 (5th Cir. 2009) (holding an officer has no reason to believe a noncompliant driver in a parked car with the engine running is a threat). *But see Lytle v. Bexar County*, 560 F.3d 404, 411 (5th Cir. 2009) ("[T]he [Supreme] Court's decision in *Scott* did not declare open season on suspects fleeing in motor vehicles.").

[48] *See Lytle*, 560 F.3d at 411 ("Our standard of review [in a qualified immunity] interlocutory appeal—namely, whether a reasonable jury could enter a verdict for the non-moving party—emphasizes the importance of juries in cases of alleged excessive force."). Roper provided a report from the department's forensic expert identifying the sound of two shots occurring after Bowden was shot. Roper argues that the two other shots are not audible in the video because they occurred when Crane's car was too far away for the dashcam to pick up the noise. When the shots were fired, and whether there was a continuing threat that necessitated the use of deadly force, is a question that ought to be resolved by a jury. *See Mason v. Lafayette City-Parish Consolidated Gov.*, 806 F.3d 268, 278 (5th Cir. 2015) (holding an officer was entitled to qualified immunity as to the first five shots, but given the competing narratives, material fact disputes precluded qualified immunity as to the final two shots).

[49] *See Harmon*, 16 F.4th at 1165.

[50] We note that Roper did warn Crane that he would shoot him if he did not turn the car off. "*Garner* . . . requires a warning before deadly force is used 'where feasible,' a critical component of risk assessment and de-escalation." *Cole*, 935 F.3d at 453 (quoting *Garner*, 471 U.S. at 11). However, according to the passengers, when Crane lowered his hand to comply, Roper shot him.

No. 21-10644

to shooting Crane—plainly available, but Bowden, reached into the backseat to touch Roper, repeatedly urging Roper to "get out" of the car, reflecting the sound view that they could not use deadly force to keep Crane from fleeing. But Roper remained in the car, shooting Crane just seconds later. A reasonable jury could conclude that reasonable officers, like Bowden, would have been keenly aware that deadly force should not have been used, and that instead, Crane should have been let go to take his child home; that Crane did not pose a threat of harm such that the use of deadly force was reasonable. The threat-posed factor favors Crane.

While the remaining two factors do not weigh as heavily upon our analysis, they yet demand attention.[51] As to the severity of the crime at issue, Roper was attempting to effect an arrest for an unconfirmed felony probation violation warrant and multiple confirmed misdemeanor warrants. Although police officers have the right to order a driver to exit the car,[52] they cannot use excessive force to accomplish that end.[53] Reasonable officers could debate the level of force required to effect an arrest given the severity of the violations at issue,[54] but neither of the other officers felt the need to enter the car or draw their pistols to address the severity of the violation. Rather, the arresting officer attempted to intervene to stop Roper. This factor favors Crane.

The third *Graham* factor is whether Crane was actively resisting arrest or attempting to evade arrest by fleeing. "Officers may consider a suspect's

---

[51] *Aguirre v. City of San Antonio*, 995 F.3d 395, 408 (5th Cir. 2021).

[52] *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977).

[53] *Deville*, 567 F.3d at 167.

[54] *Tucker v. City of Shreveport*, 998 F.3d 165, 178 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 419 (2021).

refusal to comply with instructions during a traffic stop in assessing whether physical force is needed to effectuate the suspect's compliance."[55] While Crane was compliant with Bowden's initial requests, he refused to comply once the officers attempted to arrest him. It is clear from the video that the officers attempted to arrest Crane peacefully, but he refused to cooperate. Bowden first told Crane to step out of the car and within one minute she informed him that there was an outstanding warrant for his arrest. Two minutes later, Roper entered the vehicle and applied physical force, grabbing Crane, and pointing his gun at him. The other officers continued to order Crane to turn off the vehicle. On the present record, Roper shot Crane within 30 seconds of entering Crane's vehicle, as Crane reached to turn off the vehicle. The car was in park and Crane pressed the accelerator to relieve the pressure on his neck. Taking the facts as we must, a jury may well conclude that it was not reasonable for Roper to believe that Crane was attempting to flee or that any such attempt to do so posed a threat to life. Additionally, "officers must assess not only the need for force, but also 'the relationship between the need and the amount of force used.'"[56] The only confirmed warrants against Crane were for misdemeanors. A jury could reasonably find that the *degree* of force the officers used was not justifiable under the circumstances. This factor favors Crane. In sum, with all three of the *Graham* factors favoring Crane, Crane prevails.

Crane argues, notwithstanding the *Graham* factors, that Roper created the situation by escalating the confrontation—entering the car and grabbing Crane. But our precedent dictates that the threat be examined only at the moment deadly force is used and that an officer's conduct leading to

---

[55] *Deville*, 567 F.3d at 167.

[56] *Deville*, 567 F.3d at 167 (quoting *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)).

that point is not considered.[57] Roper's actions prior to the moment he used deadly force, escalatory as they were, cannot be considered. The issue is not whether Roper created the need for deadly force, the issue is whether there was a reasonable need for deadly force.

Under the *Graham* factors, Roper's use of deadly force was unreasonable. Because Roper's use of force in this situation was unreasonable, violating Crane's Fourth Amendment right, we now turn to the clearly established prong.

## B.

The second step of the qualified immunity inquiry is asking "whether the violated constitutional right was clearly established at the time of the violation."[58] The purpose of this inquiry is to determine whether the officer "had fair notice that [his] conduct was unlawful."[59]

"It has long been clearly established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others."[60] This applies not only to a felon fleeing on

---

[57] *Serpas*, 745 F.3d at 772. We recognize a split among the Circuits as to whether the officers' actions leading up to the shooting is relevant for purposes of an excessive force inquiry. *Compare id.* ("[A]ny of the officers' actions leading up to the shooting are not relevant for the purposes of an excessive force inquiry in this Circuit."); *with Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997) (considering an officer's reckless and deliberate conduct in creating the need to use force to determine the reasonableness of the force).

[58] *Lytle*, 560 F.3d at 417.

[59] *Brosseau*, 543 U.S. at 198.

[60] *Lytle*, 560 F.3d at 417.

foot,[61] but also to one fleeing in a motor vehicle.[62] We note that the Supreme Court and this court decline to apply *Garner* with a high-level of generality.[63] While "[w]e do not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate."[64] The central concept is that of "fair warning,"[65] in which "the contours of the right in question are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"[66] We have recognized that "qualified immunity will protect 'all but the plainly incompetent or those who knowingly violate the law.'"[67] Here, precedent provided Roper with fair notice that using deadly force on an unarmed, albeit non-compliant, driver held in a chokehold in a parked car was a constitutional violation beyond debate.

At the time of Roper's use of deadly force, "the law was clearly established that although the right to make an arrest 'necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect

---

[61] *Garner*, 471 U.S. at 20–21.

[62] *Lytle*, 560 F.3d at 417–18.

[63] *See, e.g.*, *Brosseau*, 543 U.S. at 199; *Harmon*, 16 F.4th at 1166.

[64] *Ashcroft*, 563 U.S. at 741; *see also Trent v. Wade*, 776 F.3d 368, 383 (5th Cir. 2015) ("The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." (quoting *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir.2004) (en banc))).

[65] *Trent*, 776 F.3d at 383.

[66] *Breen v. Texas A&M Univ.*, 485 F.3d 325, 338 (5th Cir. 2007), *withdrawn in part on reh'g*, 494 F.3d 516 (5th Cir. 2007) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

[67] *Harmon*, 16 F.4th at 1167 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

No. 21-10644

it,'"[68] the constitutionally "permissible degree of force depends on the severity of the crime at issue, whether the suspect posed a threat to the officer's safety, and whether the suspect was resisting arrest or attempting to flee."[69] In *Garner*, the Supreme Court made clear that "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."[70]

Here, under Crane's account, Crane was shot while he was held in a chokehold in a parked car while evading arrest for several confirmed misdemeanors and an unconfirmed felony parole violation. Roper was on notice that the use of deadly force is objectively reasonable only where an officer has "a reasonable belief that he or the public was in imminent danger . . . . of death or serious bodily harm."[71] Again, Roper's alleged belief that Crane had a gun was not reasonable, nor was his belief that a parked car posed a danger to himself, the passengers, or the other officers standing on the side of the car. When we accept the facts as we must, this case is an obvious one.[72] "While the Fourth Amendment's reasonableness test is 'not capable of precise definition or mechanical application,'"[73] the test is clear enough that

---

[68] *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (footnote omitted) (quoting *Saucier*, 533 U.S. at 201–02).

[69] *Id.*

[70] *Garner*, 471 U.S. at 11.

[71] *Flores v. City of Palacios*, 381 F.3d 391, 401 (5th Cir. 2004).

[72] *See Roque v. Harvel*, 993 F.3d 325, 335 (5th Cir. 2021) ("[I]in an obvious case, general standards can 'clearly establish' the answer, even without a body of relevant case law." (cleaned up) (quoting *Brosseau*, 543 U.S. at 199)); *see also Darden*, 880 F.3d at 733 ("[I]n an obvious case, the *Graham* excessive-force factors themselves can clearly establish the answer, even without a body of relevant case law.").

[73] *Bush*, 513 F.3d at 502 (quoting *Graham*, 490 U.S. at 396).

No. 21-10644

Roper should have known he could not use deadly force on an unarmed man in a parked car.

Because the facts seen in the light most favorable to Crane indicate a violation of a clearly established right and material facts are in dispute, the district court erred in granting summary judgment to Roper and perforce dismissing the City.

## V.

We turn to the claims of the three passengers—Jefferson, Valencia Johnson, and Z.C.—against Roper and the City, suing under § 1983 and claiming that Roper's actions violated their Fourth Amendment rights. The passengers argue that they are entitled to damages under two theories of liability.

First, they claim that they suffered emotional trauma by witnessing the excessive use of force against Crane. But witnessing the use of force is not enough. "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law."[74] "Negligent infliction of emotional distress is a state common law tort; there is no constitutional right to be free from witnessing [ ] police action."[75] Thus, bystanders may recover when they are subject to an officer's excessive use of force such that their own Fourth Amendment right is violated; however, bystanders cannot recover when they only witness excessive force used upon another.[76]

---

[74] *Baker v. McCollan*, 443 U.S. 137, 146 (1979).

[75] *Grandstaff v. City of Borger*, 767 F.2d 161, 172 (5th Cir. 1985).

[76] *Harmon*, 16 F.4th at 1168 ("Bystander excessive force claims can only succeed when the officer directs the force toward the bystander—that is to say, when the bystander is not really a bystander.").

No. 21-10644

Second, the passengers claim that Roper used excessive force when he pointed his gun at them while entering the car, leading to psychological injuries.[77] The district court dismissed the passengers' claims for failing to "establish that they were the objects of Roper's actions or that Roper's actions physically injured them."[78]

There is no express requirement for a physical injury in an excessive force claim,[79] but even if the passengers stated a plausible claim for psychological injuries, Roper is entitled to qualified immunity. "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."[80] We previously held that pointing a gun can be reasonable given the circumstances,[81] and that "the momentary fear experienced by the plaintiff when a police officer pointed a gun at him did not rise to the level of a constitutional violation[.]"[82] Here, there was no unreasonable use of force against the passengers, so no constitutional injury occurred.

---

[77] Roper argues that the passengers waived this argument, but the complaint states that the passengers sought damages for the psychological injuries arising both from witnessing Crane's death and as a result of Roper's excessive force, preserving this argument.

[78] *Crane v. City of Arlington*, 2020 WL 4040910, at *6 (N.D. Tex. July 16, 2020).

[79] *Flores*, 381 F.3d at 400–01.

[80] *Graham*, 490 U.S. at 396.

[81] *Hinojosa v. City of Terrell*, 834 F.2d 1223, 1230–31 (5th Cir. 1988).

[82] *Dunn v. Denk*, 54 F.3d 248, 250 (5th Cir. 1995), *on reh'g en banc*, 79 F.3d 401 (5th Cir. 1996) (discussing *Hinojosa*, 834 F.2d at 1230–31).

No. 21-10644

As we affirm the dismissal of the passengers' claims against Roper for a failure to state a claim in the absence of a constitutional injury, we also affirm the dismissal of their claims against the City.

**\*\*\*\***

We AFFIRM the dismissal of the passengers' claims and VACATE the grant of summary judgment on Crane's claims and REMAND to the district court for further proceedings consistent with this opinion.